UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VICKI SHINABARGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-cv-0276-DFH-TAB |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Vicki Shinabarger seeks judicial review of a final decision by the Commissioner of Social Security denying her application for disability insurance benefits. Acting for the Commissioner, an Administrative Law Judge ("ALJ") determined that Ms. Shinabarger was not disabled under the Social Security Act because she retained the residual functional capacity to perform a significant range of sedentary work. For the reasons explained below, the ALJ's decision is supported by substantial evidence and is therefore affirmed.

*Background*

Ms. Shinabarger was 48 years old in 2004 when the ALJ found her ineligible for disability insurance benefits under the Social Security Act. Ms. Shinabarger had a high school education and prior work experience as a merchandiser and a teacher's aide. R. 81, 98.

Ms. Shinabarger applied for disability insurance benefits on or around August 30, 2002. R. 56-58. She claimed to suffer from chronic pain and fibromyalgia. R. 94. She claimed that these impairments disabled her, within the meaning of the Social Security Act, after January 15, 2001. R. 56. Ms. Shinabarger also reported that she began experiencing chronic pain in 1991, that her pain increased following pregnancy, and that she suffered a specific injury to her back while doing yard work in August 2002. R. 159. Ms. Shinabarger apparently underwent a lumbar laminectomy in 1992 and cervical fusion surgery in 1996, see Pl. Br. at 4, but she has not offered any records of those surgeries.

Ms. Shinabarger submitted a daily activities questionnaire on October 6, 2002. She reported that her pain kept her from doing almost everything she used to do and that some days she was unable even to make it out of bed. She also reported that she had not driven in months and that cleaning, vacuuming, and even reaching caused extreme pain, tingling, and numbness. R. 90.

Ms. Shinabarger's primary treating physician was William Anderson, M.D. Most of Dr. Anderson's notes in the record reflect no more than Ms. Shinabarger's requests for refills of her prescription pain medications. See, *e.g.*, R. 133-39. However, Dr. Anderson's treatment notes from February 11, 2002 show that she reported pain in her lower back radiating to her left leg, intermittent numbness in both arms, and multiple tender points for fibromyalgia. R. 155. Notes from August 26, 2002 indicate that Ms. Shinabarger complained of back pain and that

Dr. Anderson prescribed Vicodin and recommended physical therapy.  He noted decreased sensation and bilateral weakness upon conducting a straight leg raise test.  R. 144.  Ms. Shinabarger submitted a letter from Dr. Anderson dated September 16, 2002, stating that she suffered from chronic pain and that she was "probably disabled from anything but sedentary work."  R. 141.

Ms. Shinabarger attended ten sessions of physical therapy in September 2002.  Notes from her therapist indicate that she rated her pain at each session as varying between 6 and 10 on a 10-point scale.  R. 160.  Ms. Shinabarger also attended a pain management clinic.  Her referral form noted that her two surgeries had not helped her back pain, which appeared chronic and exacerbated by her fibromyalgia.  R. 206.

Anton Kojouharov, M.D., conducted a consultative physical examination of Ms. Shinabarger on November 12, 2002.  Ms. Shinabarger complained of pain in her shoulder muscles, trapezoid muscles, and paravertebral muscles of the cervical and lumbosacral spine.  R. 120.  She reported increased spinal pain when bending or lifting.  She made no complaints of numbness.  R. 121.

Dr. Kojouharov recorded that Ms. Shinabarger's posture and gait were normal, and that she was able to get on and off of the examination table easily. He noted pain on palpation over the muscles of both shoulders and trapezoid muscles.  He also noted pain on palpation of C4-C5-C6 of the spine and L4-L5-S1

-3-

of the lumbosacral spine with painful and limited range of motion of both.  R. 122.

Dr. Kojouharov observed that Ms. Shinabarger was able to squat, tip toe, and

stand on her heels.  He found normal muscle strength in all muscles, normal

gross and fine finger manipulative ability, and normal skin sensitivity, but

relatively low grip strength.  He recorded a negative straight leg raising test from

both the sitting and supine positions.  He observed no spasm of her paravertebral

muscles.  His impressions were that Ms. Shinabarger suffered from fibromyalgia,

cervical spine pain (post-fusion), lumbosacral spine pain (post-lower back

surgery), degenerative disc disease of both the cervical and lumbar spine,

bronchial asthma, and hypothyroidism.  R. 123.

Ms. Shinabarger's claim for disability benefits was denied on December 5,

2002.  R. 36.  She filed a request for reconsideration on February 7, 2003.  R. 33.

She also completed a reconsideration disability report stating that her pain had

worsened and that she had begun taking Prozac for depression.  R. 75.

Ms. Shinabarger submitted a daily activities questionnaire on March 18,

2003.  She reported "unbearable pain" and difficulty doing most daily activities.

R. 63-67.  Her mother submitted a report corroborating these responses.  See R.

69-73.

Aldo Buonanno, M.D., conducted a mental status consultative examination

of Ms. Shinabarger on March 22, 2003.  Ms. Shinabarger reported that she had

back surgery in approximately 1991 to correct two discs in her back.  She took medication and tried returning to work, but she became pregnant, which put more strain on her back.  She also told Dr. Buonanno that it was difficult for her even to hold a book because of previous neck surgery.  Dr. Buonanno noted that Ms. Shinabarger walked with a limp and reported "constant pain daily."  She told Dr. Buonanno that she "used to enjoy her job and the students very much."  She reported that she had not driven in years because of her pain.  R. 116-17.

Dr. Buonanno rated Ms. Shinabarger at 65 on the Global Assessment Functioning ("GAF") scale and concluded that her limitations were primarily physical in nature.[1]  Dr. Buonanno listed her diagnosis as "adjustment disorder with depressed mood" stemming from "loss of employment from a job she loved and chronic pain."  R. 117.

On April 21, 2003, Ms. Shinabarger saw Dr. Anderson about right shoulder pain that she said was caused by falling onto her porch.  R. 199.  A CT scan revealed a "depression fracture at the greater tuberosity of right humeral head."  R. 204-05.

---

[1]A GAF of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well, has some meaningful interpersonal relationships."  American Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. text rev. 2000) (DSM-IV-TR).

A consultative examiner completed a psychiatric review of Ms. Shinabarger on May 2, 2003. She was noted as suffering from "adjustment disorder with depressed mood." R. 104. She was rated as having mild restriction of daily activities, mild difficulties in social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. R. 111. The examiner also rated Ms. Shinabarger at 65 on the GAF scale and concluded that her depression was attributable to her loss of employment, chronic pain, and the limitations in her motion and activities. R. 113. The examiner noted that Ms. Shinabarger reported she did not drive because of pain and that she received a lot of help from her family. *Id.*

Ms. Shinabarger's request for reconsideration was denied on May 2, 2003. R. 25-26. She filed a request for a hearing before an ALJ in June 2003. R. 28.

In April 2004, Ms. Shinabarger visited Dr. Anderson for a review of her pain control measures. She reported that attending the pain clinic actually had increased her pain. She complained of pain mostly in her lower back, right shoulder, and neck. She also reported falling three times, including tripping on a step and falling in the shower. Dr. Anderson recorded that she had tender points consistent with fibromyalgia and a tender right shoulder. R. 180. He noted that Ms. Shinabarger needed a regimen for controlling pain, and that she still experienced significant pain even while on medication. R. 181.

Dr. Anderson saw Ms. Shinabarger for a disability physical exam on June 1, 2004. He assessed the status of her existing problems and rated her fibromyalgia, chronic back pain, chronic neck pain, depression, and tachycardia as "deteriorated." R. 220. In a statement of disability, Dr. Anderson wrote that Ms. Shinabarger's pain had become disabling as of January 2000. He noted that he had treated Ms. Shinabarger primarily with high doses of analgesic pain medication. He recommended that the agency contact Ms. Shinabarger's family physician at the time of her injury and two surgeries. R. 178. Dr. Anderson categorized Ms. Shinabarger as having "moderate limitation of functional capacity," meaning that she was capable of clerical administrative activity. However, he noted off to the side that she could not "sit, type, file for work day." R. 177.

Ms. Shinabarger, Dr. Arthur Lorber, a physician board-certified in orthopedic surgery, and Gail Corn, a vocational expert, testified before ALJ Paul Armstrong on June 23, 2004. See R. 223-60. Ms. Shinabarger testified that she suffered from constant numbness and pain in her left leg and hands and pain in her right shoulder and back. She also testified that her efforts at pain therapy had been unsuccessful.

Dr. Lorber opined that Dr. Kojouharov's exam revealed no focal neurologic deficit in Ms. Shinabarger's upper or lower extremities and therefore her condition did not meet or equal an impairment in Listing 1.04. R. 250. He noted that there

were no other meaningful clinical examinations in the record.  *Id.*  Dr. Lorber observed that at the hearing, Ms. Shinabarger appeared to be affected by osteoarthritis in her fingers, but that this was not noted in any of her records.  R. 256.  The ALJ suggested that Ms. Shinabarger see a rheumatologist for an x-ray of her hands.  R. 257.

Ms. Corn testified that Ms. Shinabarger would be able to perform sedentary work even with low grip strength if she retained fine finger manipulation.  R. 255.  However, she testified that the inability to perform repetitive fine finger manipulation would eliminate all possible jobs.  R. 258.

Following the hearing, Ms. Shinabarger had x-rays taken of her left knee and hands.  The x-rays showed joint effusion in her knee, but its clinical significance was unclear.  Her hand showed some mild soft tissue swelling, possibly indicative of early osteoarthritis.  R. 208-09.

The ALJ issued his decision denying benefits on September 24, 2004.  See R. 17-24.  In her request for review, Ms. Shinabarger reported that a recent MRI showed degenerative disc disease, failed back syndrome, two bulging discs, arthritis, and scar tissue, but these results are not part of the record.  She also provided an updated list of her medications.  This list states that she may take morphine four to six times per day.  In addition, Ms. Shinabarger denied that Dr. Kojouharov actually tested and observed some of the information that he recorded

during his consultative examination in November 2002.  Specifically, she claimed that Dr. Kojouharov never had her squat or stand on her heels or toes, and that it was actually quite painful for her to get on and off of the examination table.  R. 9, 11-12.

The Appeals Council denied further review of the ALJ's decision, R. 6, so the ALJ's decision is treated as the final decision of the Commissioner.  See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Ms. Shinabarger filed a timely petition for judicial review.  The court has jurisdiction in the matter under 42 U.S.C. § 405(g).

### *The Statutory Framework for Determining Disability*

To be eligible for disability insurance benefits, a claimant must establish that she suffers from a disability within the meaning of the Social Security Act.  To prove disability under the Act, the claimant must show that she was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that has lasted or could be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d).  Ms. Shinabarger was disabled only if her impairments were of such severity that she was unable to perform work that she had previously done and if, based on her age, education, and work experience, she also could not engage in any other kind of substantial work existing in the

national economy, regardless of whether such work was actually available to her. *Id.*

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

The implementing regulations for the Act provide the familiar five-step process to evaluate disability.  The steps are:

(1)  Has the claimant engaged in substantial gainful activity?  If so, she was not disabled.

(2)  If not, did the claimant have an impairment or combination of impairments that are severe?  If not, she was not disabled.

(3)  If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)  If not, could the claimant do her past relevant work?  If so, she was not disabled.

(5)  If not, could the claimant perform other work given her residual functional capacity, age, education, and experience?  If so, then she was not disabled.  If not, she was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Applying the five-step process, the ALJ found that Ms. Shinabarger satisfied dstep one because she had not engaged in substantial gainful activity since her alleged onset date of disability.  At step two, the ALJ found that Ms. Shinabarger suffered the severe impairments of "degenerative disc disease, status post cervical laminectomy, fibromyalgia, and asthma."  R. 23.  At step three, the ALJ found that Ms. Shinabarger failed to demonstrate that any of her severe impairments met or equaled a listed impairment.  At step four, the ALJ found that Ms. Shinabarger was unable to perform any of her past relevant work.  R. 24.  At step five, the ALJ found that Ms. Shinabarger retained the residual functional capacity to perform a significant range of sedentary work.  Based on these findings, the ALJ concluded that Ms. Shinabarger was not disabled within the meaning of the Social Security Act.

*Standard of Review*

"The standard of review in disability cases limits . . . the district court to determining whether the final decision of the [Commissioner] is both supported by substantial evidence and based on the proper legal criteria."  *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), quoting *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  To determine whether substantial evidence exists, the court must "'conduct a critical review of the evidence,' considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision . . . ." *Briscoe*, 425 F.3d at 351, quoting *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); see also *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).  The court must not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based his decision on serious factual mistakes or omissions.  *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  This determination by the court requires that the ALJ's decision adequately discuss the relevant issues:   "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."   *Briscoe*, 425 F.3d at 351, citing *Herron v. Shalala*, 19 F.3d 329, 333-34 (7th Cir. 1994).

Although the ALJ need not provide a complete written evaluation of every piece of testimony and evidence, *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005), a remand may be required if the ALJ has failed to "build a logical bridge from the evidence to his conclusion." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

## *Discussion*

Ms. Shinabarger argues that the ALJ (1) erred in evaluating her spinal impairments; (2) improperly determined whether her fibromyalgia met or equaled a listed impairment; (3) improperly rejected her treating physician's opinion; and (4) failed to explain his adverse credibility finding. Ms. Shinabarger also argues that the hypothetical question posed by the ALJ to the vocational expert did not incorporate all of her limitations and symptoms, but this argument adds nothing to her other arguments. The ALJ must only include in his hypothetical question to the vocational expert only those limitations that she finds to be credibly supported by the evidence. See *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). The court addresses Ms. Shinabarger's other four arguments below.

## I.   *Spinal Impairments*

Ms. Shinabarger raises two issues with the ALJ's analysis of her spinal impairments. First, she argues that the ALJ erred by listing "status post cervical laminectomy" as one of her severe impairments when she never had a cervical

laminectomy. Instead, she had cervical fusion surgery in 1996. Ms. Shinabarger claims that cervical fusion surgery is a far more invasive and limiting procedure. Second, she points out that she underwent a lumbar laminectomy in 1992. Ms. Shinabarger contends that the ALJ failed to consider this surgery or her related lumbar problems despite evidence in the record of leg numbness and pain. As a result of both of these mistakes, she argues, the ALJ's entire framework for evaluating the severity of her impairments was flawed.

A.    *Cervical Spinal Surgery*

The record contains inconsistent information about the types of spinal surgery Ms. Shinabarger has undergone. Compare R. 120 (Dr. Kojouharov's notes: discectomy at L4-L5 and cervical spine fusion surgery), with R. 176, 206 (Dr. Anderson's notes: lumbar laminectomy and cervical laminectomy). As the ALJ pointed out in his decision, there are no operative reports or related radiological results in the record. The ALJ did ask Ms. Shinabarger at the hearing about both her cervical fusion surgery and her lumbar laminectomy. See R. 229-30, 231-32. It is clear that, at least at the time of the hearing, the ALJ had a correct understanding of Ms. Shinabarger's surgical history. His misidentification of her cervical fusion surgery as a cervical laminectomy in his written decision is a harmless error.

Ms. Shinabarger acknowledges that there are conflicting references in the record, but she points out that the agency's own examining physician (Dr.

Kojouharov) specifically noted in his records that she had undergone cervical fusion surgery. Ms. Shinabarger also argues that cervical fusion surgery is most consistent with her long-term efforts at pain management and the range of motion limitations in her neck, as demonstrated at the hearing and as recorded by Dr. Kojouharov. Ms. Shinabarger argues that a correct characterization of her cervical spinal surgery might have supported a listing-level determination, a more limited residual functional capacity, or a finding that her complaints about pain and functional limitations were credible.

The court is not convinced that the ALJ's mistaken reference to "status post cervical laminectomy" instead of cervical fusion surgery led to an incorrect analysis of Ms. Shinabarger's cervical spinal condition. In general, a laminectomy involves removing bone or thickened tissue blocking the spinal canal that is caused by degenerative changes in the spine. Cervical fusion surgery involves fusing one vertebra to another to decrease motion and pain at that segment, and it is sometimes performed in conjunction with a laminectomy to prevent disc space collapse in the area where bone or tissue has been removed. See, *e.g.*, http://www.spine-health.com (spine surgery overview) (last visited March 31, 2006). The difference between the two surgical procedures is not the focus here. In deciding disability, the ALJ must evaluate the severity of actual impairments, not differentiating between surgical procedures. An impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R.

§ 404.1508.  A severe impairment is defined by the regulations as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520; see also *Nelson v. Apfel*, 210 F.3d 799, 802 (7th Cir. 2000).  In this case, the ALJ identified degenerative disc disease and status post cervical laminectomy as severe impairments, and therefore he acknowledged that Ms. Shinabarger's cervical spinal problems significantly limited her physical ability to do basic work.

The ALJ's next step was to evaluate whether Ms. Shinabarger's severe impairments met or equaled a listed impairment in Appendix 1, Subpart P, Regulations No. 4.  Ms. Shinabarger has not explained persuasively how this step might have come out differently if the ALJ had described her surgery as cervical fusion surgery.  Listing 1.04 would apply in either case:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
> With:
>    A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>    B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>    C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04.  The ALJ specifically considered whether Ms. Shinabarger's condition met or equaled Listing 1.04 but concluded that it did not because she lacked the "significant and persistent neurological abnormalities" required by the Listing.  R. 19.  He found no evidence in the record of "nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in an inability to ambulate effectively."  *Id.*  The ALJ noted that this conclusion was consistent with Dr. Lorber's testimony from the hearing.  R. 20. Dr. Lorber had testified that Ms. Shinabarger did not meet Listing 1.04 because there was no evidence of "focal neurologic deficit involving either her upper or lower extremities."  R. 250.

The ALJ's step-three finding is supported by substantial evidence, even taking into account Ms. Shinabarger's cervical fusion surgery.  At step three, the claimant has the burden of proving that her impairment meets all of the specified medical criteria in the listing.  *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002), citing *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990).  Ms. Shinabarger has not met that burden.

First, it was entirely appropriate for the ALJ to rely on Dr. Lorber's assessment.  See 20 C.F.R. § 404.1527(f).  He had reviewed the entire medical record and he expressly opined that Ms. Shinabarger's impairments did not meet or equal Listing 1.04.  Ms. Shinabarger's attorney was given the opportunity to question Dr. Lorber at the hearing but declined to do so.  See R. 252.

Ms. Shinabarger now argues that Dr. Lorber's opinion was conclusory and not helpful because he did not advise the ALJ that she could meet Listing 1.04A based on the limitation of motion in her neck from the fusion, the tingling of her arms, dysfunction of her hands and thumbs, and chronic pain.  These physical signs and limitations were part of the record and presumably were considered by both the ALJ and Dr. Lorber, whether or not they were attributable to her cervical fusion surgery.   Moreover, the ALJ's reasons for rejecting a listing-level impairment were independent of Ms. Shinabarger's surgical history.  She had offered no x-ray, MRI, or other radiological test results that might demonstrate the type of abnormal physical findings required by the Listing.  Even though she may have shown pain and range of motion limitations consistent with Listing 1.04A, both the ALJ and Dr. Lorber concluded that she lacked the neurological deficiencies necessary to meet that listing.  Ms. Shinabarger claimed to suffer from tingling in her arms, but the ALJ noted that she denied numbness in her visit to Dr. Kojouharov and that a pin-prick test revealed normal skin sensitivity.  The ALJ also considered Ms. Shinabarger's alleged dysfunction of her hands and thumbs.  He acknowledged at the hearing that cervical spine (neck) problems might affect fine finger manipulation, see R. 255, but he noted in his decision that Dr. Kojouharov's examination found normal gross and fine finger manipulation. The ALJ also noted that Dr. Kojouharov rated Ms. Shinabarger's muscle strength at "5 out of 5" in all muscles tested, and that he observed her walking normally without assistance.  In short, the ALJ's conclusion that Ms. Shinabarger did not show "motor loss (atrophy with associated muscle weakness or muscle weakness)

accompanied by sensory or reflex loss" to satisfy Listing 1.04A is supported by substantial evidence.

Similarly, Ms. Shinabarger has not shown that the ALJ's analysis in later steps might have changed if he had correctly characterized her surgery as cervical fusion surgery.  She argues that identifying the correct surgery would have provided more credibility for her complaints about pain and limited range of spinal motion.  But the ALJ explicitly acknowledged Ms. Shinabarger's painful and limited range of motion in both the lumbar and cervical areas of her spine, and he acknowledged that she suffered from chronic pain, particularly in the neck and lower back.  R. 21.  Despite the credit he gave this evidence, the ALJ concluded that the medical evidence as a whole did not objectively demonstrate the degree of pain and limitations she alleged.  In reaching this conclusion, he noted that most of her medical records were only requests for prescription refills.  He also cited Dr. Kojouharov's findings that she had full range of motion in all joints of the upper and lower extremities.  Dr. Kojouharov also recorded normal cervical spine rotation.  Because the ALJ actually credited the limitations attributable to Ms. Shinabarger's cervical fusion surgery, she cannot disturb his credibility finding based on his failure to recognize that surgery as a separate severe impairment.

Finally, Ms. Shinabarger has offered no viable argument as to how the ALJ's residual functional capacity finding should change because of her cervical fusion surgery.  In *Skarbek v. Barnhart*, the court affirmed the ALJ's residual functional

capacity finding despite the ALJ's failure to consider the claimant's obesity. 390 F.3d 500, 504 (7th Cir. 2004). The claimant had failed to specify how his obesity further impaired his ability to work, and had merely speculated that his weight made it more difficult for him to stand and walk. The Seventh Circuit found no reason to remand the case where the ALJ had adopted the recommendations of doctors and specialists who were aware of the claimant's impairment. *Id.*

Similarly, in this case, Ms. Shinabarger's treating and examining physicians were aware of her cervical spinal fusion surgery when they recorded their physical findings and offered their medical opinions. The ALJ and Dr. Lorber also were aware of Ms. Shinabarger's fusion surgery at the time of the hearing when they evaluated her testimony about pain and limited neck motion. Because Ms. Shinabarger has not specified how the surgery impaired her ability to work – in ways not already reflected in the objective medical evidence – the court need not remand solely because of the ALJ's error.

The ALJ's misidentification of Ms. Shinabarger's cervical spinal surgery was a factual error, but the issue is whether it warrants remand. See *Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (doctrine of harmless error applies to review of ALJ's decision to deny benefits). A reviewing court is not required to reverse an ALJ's decision where an error did not ultimately affect the outcome of the case. *Shramek v. Apfel*, 226 F.3d 809, 814-15 (7th Cir. 2000), citing *Sarchet v.*

*Chater*, 78 F.3d 305, 309 (7th Cir. 1996) (where ALJ's decision is unreliable because of serious mistakes or omissions, "the reviewing court must reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion, in which event a remand would be pointless"); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [this court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). The court is satisfied that the ALJ's error in misidentifying Ms. Shinabarger's surgery did not ultimately affect the outcome of this case.

B.   *Lumbar Spinal Issues*

Contrary to Ms. Shinabarger's assertion, the ALJ did consider her lumbar spinal problems.  He noted in his decision that she had back surgery at the L4-5 level in 1991.  He did not err by omitting this surgery from the list of severe impairments because, as noted above, the surgery itself is not a physical abnormality.  The ALJ recognized Ms. Shinabarger's degenerative disc disease as a severe impairment.

Ms. Shinabarger has not identified sufficient evidence in the record to support a listing-level impairment for her lumbar problems.  As discussed above, both the ALJ and Dr. Lorber analyzed her impairments under Listing 1.04 and reasonably concluded that she did not satisfy the listing.

Finally, the ALJ's residual functional capacity determination, as it relates to Ms. Shinabarger's lumbar impairment, is supported by substantial evidence. The ALJ noted in his decision that Dr. Kojouharov recorded a negative straight leg raising test.   The ALJ also discussed Dr. Kojouharov's findings that Ms. Shinabarger was able to get on and off the examining table easily, had a normal gait, and was able to squat, tip toe, and stand on her heels.  Ms. Shinabarger argues generally that the ALJ overlooked evidence of leg numbness and pain, but she has not identified any specific evidence in the record of this.  These limitations appear to be derived only from her own testimony, which the ALJ found to be not credible.  In fact, Dr. Kojouharov specifically noted that she had no complaints of numbness.  The ALJ did not err in his assessment of Ms. Shinabarger's lumbar spinal problems.

II.   *Fibromyalgia*

Ms. Shinabarger next argues that the ALJ erred in evaluating whether her fibromyalgia met or equaled a listed impairment.  The ALJ analyzed this condition under Listing 1.02, a musculoskeletal listing related to joint dysfunction.  Ms. Shinabarger contends that fibromyalgia is more properly analyzed under Listing 14.09 for inflammatory arthritis.

Fibromyalgia is a rheumatic disease characterized by symptoms of "pain all over," fatigue, disturbed sleep, stiffness, and multiple tender pressure points on the body.  See *Sarchet*, 78 F.3d at 306 (citing several medical sources).  There is

no agency listing specific to fibromyalgia.  The regulations provide that if an impairment is not listed, the agency will consider the listed impairment most like the claimant's impairment to decide whether the impairment is medically equivalent.  20 C.F.R. § 404.1526.

The parties have not cited and the court has not located any case law or other authority discussing the proper listing for evaluating fibromyalgia. Fibromyalgia is often diagnosed only after ruling out "other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue." *Green-Younger v. Barnhart*, 335 F.3d 99, 109 (2d Cir. 2003), quoting *Preston v. Sec. of Health and Human Services*, 854 F.2d 815, 819 (6th Cir. 1988); see also *Johnson v. Bowen*, 675 F. Supp. 1137, 1141-42 (N.D. Ind. 1987) (reviewing ALJ's step-three finding of medical equivalence for claimant's fibromyalgia and fibromyositis under Listing 1.02).  Listing 1.02 and Listing 14.09 are closely related:  Listing 14.00B6, which supplements Listing 14.09, states: "When persistent deformity without ongoing inflammation is the dominant feature of the impairment, it should be evaluated under 1.02 . . . ." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.00B6.

In any case, the court need not resolve this issue.  As the Commissioner points out, Ms. Shinabarger has not shown that she can meet the requirements of Listing 14.09.  In demonstrating medical equivalence, the claimant has the burden of presenting "medical findings equal in severity to *all* the criteria for the

one most similar listed impairment." *Sims*, 309 F.3d at 428, quoting *Sullivan*, 493 U.S. at 530-31 (emphasis in original).  Listing 14.09A is the most relevant section here.  Listing 14.09A, together with Listing 14.00B6, requires that the claimant show a documented history of joint pain, swelling, and tenderness, with signs of inflammation or deformity in major joints causing difficulties in ambulation or fine or gross movements, or difficulties with other joints that cumulatively result in "serious functional deficit."

Ms. Shinabarger has not demonstrated that the medical evidence satisfies these requirements.  Dr. Kojouharov's exam showed normal ambulation, normal fine and gross finger manipulation, normal range of motion in the upper and lower extremities, and normal muscle strength.  These findings are directly contrary to Listing 14.09's requirements.  Viewing the record as a whole, the ALJ's step-three evaluation of Ms. Shinabarger's fibromyalgia is supported by substantial evidence.

III.    *Treating Physician's Opinion*

Ms. Shinabarger also argues that the ALJ erred by failing to credit Dr. Anderson's opinion that she was disabled.   A treating physician's opinion regarding the nature and severity of a claimant's medical condition is entitled to controlling weight if well-supported by medically acceptable techniques and not inconsistent with other substantial evidence in the record.    20 C.F.R. § 404.1527(d)(2); *Skarbek*, 390 F.3d at 503.  However, an ALJ may discount a treating source's opinion if it is inconsistent with the opinion of a consulting

physician or if the treating source's opinion is internally inconsistent, as long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Skarbek*, 390 F.3d at 503, citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) (physician opinion "may be discounted if it is internally inconsistent"). An ALJ need not defer to a treating physician's determination of a claimant's residual functional capacity or his conclusion that a claimant is "disabled" or "unable to work." 20 C.F.R. § 404.1527(e)(1) & (2); *Clifford*, 227 F.3d at 870.

The ALJ adequately explained his reasons for discounting Dr. Anderson's opinion that Ms. Shinabarger was disabled. See R. 21-22. First, as the ALJ explained, Dr. Anderson's opinion was internally inconsistent. Dr. Anderson wrote in June 1, 2004 that Ms. Shinabarger was totally disabled from any job, but at the same time stated that she had only moderate limitation of her physical functional capacity, rendering her capable of clerical administrative (sedentary) activity. Dr. Anderson also wrote that Ms. Shinabarger's pain had become disabling as of January 2000, even though in September 2002 he opined that she was "probably disabled from anything but sedentary work." The ALJ did not err by concluding that Dr. Anderson's opinion deserved less weight in view of the inconsistencies. Moreover, the ALJ was not required to defer to Dr. Anderson's opinion that Ms. Shinabarger was "disabled" since this issue is reserved to the Commissioner for ultimate determination.

Second, Dr. Anderson's opinion is not well-supported by the medical evidence in the record.  See 20 C.F.R. § 404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."); SSR 96-2p ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.").  Dr. Anderson did not cite any clinical findings to support his conclusion that Ms. Shinabarger was totally disabled, and his examination notes contained few such findings.

Ms. Shinabarger contends that the ALJ overlooked "consistent evidence" in the record about her pain, limited range of spinal movement, daytime fatigue, and limited use of her hands.  As the ALJ recognized, Ms. Shinabarger did not allege pain in her hands or knees when filing for disability, and she did not complain about such pain during her consultative examination with Dr. Kojouharov.  Dr. Kojouharov recorded normal gross and fine finger manipulative ability.  The ALJ also noted that Ms. Shinabarger's post-hearing radiological evidence showed no significant arthritis in the joints of her hands, but only mild tissue swelling possibly indicative of early osteoarthritis.  Even when Dr. Anderson assessed Ms. Shinabarger's limitations, he found no limitations in the use of her hands.  See R. 177.  Based on this evidence, the ALJ's finding that Ms. Shinabarger's hand problems did not prevent her from performing sedentary work is supported by substantial evidence.

In addition, the ALJ did not deny that Ms. Shinabarger suffered from chronic pain.  He simply found that it was not as limiting as she alleged.  Also, Ms. Shinabarger cites no evidence in the record relating to her allegation of daytime fatigue.  She did testify at the hearing that she experienced trouble sleeping at night and, as a result, took naps during the day.  R. 245.  But there is no evidence connecting these circumstances to her medications or any of her alleged medical impairments.   Finally, the ALJ properly considered Ms. Shinabarger's limited spinal movement, as discussed above.

Ms. Shinabarger argues that if there were any inconsistencies in Dr. Anderson's opinion, the ALJ had a duty under SSR 96-5p to contact Dr. Anderson directly for clarification.  This argument misunderstands the deficiencies of Dr. Anderson's opinion.  SSR 96-5p provides that the agency must "make every reasonable effort to recontact [treating] sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear  . . . ."  SSR 96-5p does not require the agency to recontact a treating physician when his opinion is internally inconsistent or inconsistent with other medical evidence in the record.  See, *e.g.*, SSR 96-2p ("Ordinarily, development should not be undertaken for the purpose of determining whether a treating source's medical opinion should receive controlling weight if the case record is otherwise adequately developed.").

In this case, Dr. Anderson made clear the bases for his opinion that Ms. Shinabarger was disabled. He wrote that she had chronic pain that appeared to be permanent, and he noted that she was taking high doses of pain medications. See R. 141, 178. The ALJ considered this evidence in his decision but found that it was not controlling. An ALJ must recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled. See 20 C.F.R. § 404.1512(e); *Skarbek*, 390 F.3d at 504. Here, the ALJ had Dr. Anderson's complete examination records. Although Dr. Anderson recommended that the agency contact Ms. Shinabarger's family physician at the time of her original injury and surgeries, this information would not have assisted the ALJ in evaluating Ms. Shinabarger's functional limitations at the time of the hearing. The ALJ acted within his discretion in concluding that the evidence was adequate to make a disability determination. The ALJ's decision to discredit Dr. Anderson's opinion complied with the law.

IV.  *Claimant's Credibility*

Finally, Ms. Shinabarger argues that the ALJ failed to explain adequately why he found her testimony about her pain and limitations not entirely credible. Ordinarily, because an ALJ is in a better position than a reviewing court to assess a claimant's credibility, an ALJ's credibility finding is entitled to deference and will not be disturbed unless it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). An ALJ may discount a claimant's subjective assessments where they are internally

-28-

inconsistent or inconsistent with other objective medical evidence in the record. See *Knight*, 55 F.3d at 314 (affirming ALJ's denial of disability benefits based in part on ALJ's credibility determination: "An ALJ may discount subjective complaints of pain that are inconsistent with the evidence as a whole"); SSR 96-7p ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."). However, the ALJ may not discount a claimant's complaints merely because they are not supported by objective medical evidence. *Knight*, 55 F.3d at 314. "The absence of objective medical evidence is just one factor to be considered along with: (a) the claimant's daily activities; (b) the location, duration, frequency and intensity of pain; (c) precipitating and aggravating factors; (d) type, dosage, effectiveness and side effects of medication; (e) treatment other than medication; (f) any measures the claimant has used to relieve the pain or other symptoms; and, (g) functional limitations and restrictions." *Knight*, 55 F.3d at 314, citing 20 C.F.R. § 404.1529(c)(3).

In this case, the ALJ's credibility finding is supported by substantial evidence and is not patently wrong. First, the ALJ discussed throughout his decision the absence of objective medical evidence in the record to support Ms. Shinabarger's alleged pain and limitations. He noted that Ms. Shinabarger offered no x-ray or MRI reports that might support her allegations about the severity of her neck and back pain. He also noted that the majority of the evidence in the record contained requests for prescription refills.

In addition to the absence of objective medical evidence, the ALJ considered other factors as required by the regulations.  With respect to precipitating and aggravating factors, he found that Ms. Shinabarger could not be around strong odors and that she had experienced some problems with falling.  R. 21.  He concluded that these factors were adequately accounted for by his residual functional capacity determination.  The ALJ also noted that Ms. Shinabarger took a large variety of medications, but he found no evidence in the record of significantly limiting side effects from these medications.  R. 21.  The ALJ also considered Ms. Shinabarger's efforts to treat her pain by measures other than medication.  He noted that she attended physical therapy in September 2002 and had shown some improvement in symptoms but then had a recurrence of severe pain.  He noted that she underwent biofeedback treatment at a pain clinic.  He concluded that these treatments confirmed the existence of many impairments and functional limitations but did not establish an inability to work at the sedentary level.  Cf. *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (reversing ALJ's adverse credibility finding in part because record revealed that claimant had been prescribed heavy doses of strong medications and had undergone extensive pain-treatment procedures, including implantation of spinal catheter and spinal cord stimulator).

Finally, the ALJ also discussed Ms. Shinabarger's daily activities.  He noted that she reported being able to care for her own personal grooming and hygiene, albeit at a slower pace because of pain.  He noted that she enjoyed reading and

watching television, but that she reported she was unable to cook, clean, do laundry, shop, or drive because of pain.  While the ALJ recognized that the described daily activities were "fairly limited," R. 22, he considered this factor to be outweighed by the other factors in the credibility analysis.  First, he reasoned that Ms. Shinabarger's allegedly limited daily activities could not be objectively verified.  Even if they could be verified, he concluded that it would be difficult to attribute her alleged degree of limitation to her medical condition, as opposed to other reasons, "in view of the relatively weak medical evidence" and the other factors discussed in his decision.  *Id.*  The ALJ's articulated reasons for rejecting Ms. Shinabarger's testimony about her limitations were sufficient, in light of his discussion throughout the decision of the full range of medical evidence.  Cf. *Clifford*, 227 F.3d at 872 (ALJ cannot reject claimant's testimony about limitations on daily activities without explaining *how* testimony is unsupported by medical evidence).

In making his credibility determination, the ALJ considered the relevant factors, engaged in sound reasoning, and ultimately concluded that Ms. Shinabarger was not as limited as she alleged.  This court does not have the duty or the power to reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner.  *Clifford*, 227 F.3d at 869.   The court cannot conclude that the ALJ's credibility determination was patently wrong, and therefore his determination must stand.

*Conclusion*

Ms. Shinabarger's claim suffers from a marked absence of objective medical evidence about her alleged impairments and functional limitations. The ALJ's assessments and credibility judgments were within the evidence, were explained sufficiently, and fell squarely within his responsibility. Ms. Shinabarger has offered no basis for reversing them on judicial review. The court will enter final judgment accordingly.


So ordered.

Date: March 31, 2006

*David F Hamilton*
_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana


Copies to:

Annette Lee Rutkowski
KELLER & KELLER
annette@2keller.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov